Good morning, Your Honors, and may it please the Court, Keith Donoghue for Appellant Robert Stinson. And may I'd like to reserve three minutes of my time for rebuttal. Your Honors, this case involves error at each step of the three-step procedure designed to ensure fair and proportional sentencing under the guidelines. Any of the errors, standing alone, is ground for reversal. To begin with the first step, the issue was a two-level enhancement under the fraud guideline that applies insofar as a defendant derived more than $1 million in gross receipts from a financial institution or entity. Can I ask you, that's a plain error review, right? Yes, it is. Okay. It's a high hell to climb. We are certainly on plain error review. But the plain meaning of the word derive is to obtain from a source. And here it's undisputed that the source of the funds invested in Life's Good came from individuals. What about Brentwood and Total Wealth Management? They are involved in the money going over to Stinson in one fashion or another, aren't they? Well, the fashion in which they're involved is as intermediaries. By definition, an intermediary is not the source. But they were the but-for cause of Stinson's receipt of that $1.9 million. They may be a but-for cause, that might be debatable. But when we have a fraud, the natural way to identify the source of the funds, which is to say where the funds are derived from, is to look at who is the target of the deception. Who contributes the funds by design of the scheme? You don't doubt that they're financial institutions, as defined by the guidelines? For purposes of the appeal, we'll allow that they're financial institutions. You've ducted in your brief. You say it, I think, page 32. We don't have to reach that question because the funds were not derived from. So your answer to Judge Fuentes is you essentially concede for purposes of the appeal. Yes, and we don't seek relief affirmatively on that ground. That's correct. So how does it work? Brentwood gets the clients, its own clients, and tells them that this is a great, great opportunity to make 16% return per year, and it has a five-star, morning star rating. This is really terrific, 16%, too good to be true. So maybe you should put your money there. Is that the way it works? Apparently so. One interesting dimension of the record is that the government's never- Let's go back to Judge Barry's question, though. But for Brentwood, that money would not have gone to the institutions. Right. The test is not a but-for test. The enhancement does not read if the funds would not have come in but for the financial institution, apply this enhancement. The way the enhancement reads is if the funds were derived from a financial institution. Derived from Brentwood that doesn't say derived from a client of Brentwood's. That's right. That's exactly right. So Brentwood has to suffer a loss. Not necessarily. It has to come out of their pool of funds, monies, a million dollars, whatever. That's right. It's not owned by them. They don't have to suffer a loss. But the precise test we're proposing is whether they're the source of funds, which is to say whether they were the target of the deception. But Brentwood was not the source from which the Life's Good scheme aimed to attract funds. The source was the clients of Brentwood. But the payments made by each of those clients individually, I mean, we're talking about over a million dollars. Yes. Perhaps close to 10 or 12. All that money came from individual accounts. Not from Brentwood accounts. Exactly. Not from total wealth management accounts. Correct. Is that the way it works? Precisely correct, Your Honor. So when you say derived from, the money was derived from individual investors. Exactly. If we were to say that derived from is facially ambiguous, could the application of the enhancements still be clear error, plain error? Could be clear? Well...  Could it be clear? Yes. It could, Your Honor. because although we think the meaning of the term is plain, it's confirmed clearly by the history of the guideline. The way the guideline first read was that, apply this enhancement if the offense affected an institution. And applying that standard, courts, including this one, were giving the enhancement quite a broad scope. In 2001, the Sentencing Commission amended the language and added this precondition that the funds be derived from a financial institution. And the reason the Sentencing Commission gave was that this effects language was too vague. Now... Do we have to go back into decades of legislative history or a thorough scouring of Sentencing Commission's ramblings to find that something is clear? No. In this case, you don't, Your Honor, because the meaning of derived is clear. Derived means obtained from a source. Each and every dictionary we've consulted defines it that way. There are no cases either, right? I mean, that are really directly supporting you. Now, the issue hasn't come up before, and I presume that's because district courts have not made this blatant error. Because it's so clear. Exactly. That's what they were. Didn't the Seventh Circuit and the Ninth Circuits have weighed in on this issue? What they've... The context... And they both talk about gross receipts from the institution. That's right. They've touched on the issue. But they also touched on the pre- and the post-derived amendment. That's right. And the circuits have uniformly held that this 2001 amendment was a substantive change to the guideline. So it narrowed the guideline. The most expansive discussion comes in the Seventh and Ninth Circuit decisions, which find very clear that for the enhancement to apply today, the funds have to be derived from a financial institution, not simply from the offense. One more case that's illuminating is United States v. Widener at 437 F3rd 1023. It's not directly on point, but conceptually it's illuminating because it says that only one person can derive funds. Only one person can do the deriving. The reason that's illuminating is because it underscores that derive is a word that So that's not directly on point, but it's consistent with our interpretation. But ultimately, we would say the reason there's not much appellate precedent or any directly applicable appellate precedent is because the error is so clear. Moving to the district court's error at the second step of the sentencing procedure, the problem was that the court did not conduct the departure analysis of Step 2 and the variance analysis of Step 3 independently of each other. But did he say the result would be pretty much the same? What the district court said precisely was that it had determined to go 10% above the initial guidelines range, and you could call it a departure, you could call it a variance, you could call it both, take your pick. That's exactly the kind of opaque shorthand that this court has held to be procedurally deficient. Yeah, but we can figure it out. He said on the top level, you'd add 35 months. So you figure 10% on the lower levels, you get to 321 to 401, which would be the final. It took a little work, but you can figure it out that that was the final guideline range. Interpolating. Yes, that does make sense, Your Honor. But the precedent this court has held that what a departure is, the Step 2 analysis, can't be done loosely like that. You have to look at that sentencing grid. You have to figure out what square you're moving to. That's what the district court did not do indisputably. So that mechanism is, theoretically, if we were starting from scratch, that could work. But this court has repeatedly held that there are three discrete steps. They each have to be carried through to conclusion, and the final sentencing range has to be stated expressly. Well, maybe my old district court roots are showing, but if you can figure it out, give the judge a break. Of course, it wasn't easy to figure this out. And the whole departure, what were the grounds for departure? I mean, really, you could figure about four that were listed, and the predominant one was, effectively, his criminal history was not adequately represented. Should he have gone up to a criminal history four or a criminal history five? But Judge Bailson didn't do that. He did an upward departure and came to the same range he would have come to, effectively, had he gone to a criminal history four to represent the criminal. And we can stretch, and we can, of course, none of this is really relevant if we agree with you on the two-point enhancement, correct? That's right. That's correct. And Your Honor just went through, without too much trouble, what the district court was supposed to do and, for some reason, what it did not do here. Under the FUMO decision... Did you preserve the error? If the court feels the error is not preserved, and we've made our case that it is, but if the court feels it's not, that's not material to our entitlement to relief under United States v. FUMO. This court said there that a failure to calculate the final guidelines range is error that is could seriously affect the fairness, integrity, and public reputation of proceedings. So, if it was not preserved, which there's certainly a colorable argument it was not, relief is still available in plain error review. Of course, there are the third... He did calculate. I mean, if you accept my interpolation, he did calculate the final guideline range at 321 to 401. But he didn't say that, Your Honor. And it really doesn't look like he... He gives you the 401, because he adds 35 to the 365 that had been the initial guideline range before departure. So, he gives you the 401, and then just adding 10% to the bottom of the range, you're in the same guideline range. But what the district court definitely did not say is that I've decided on the basis of criminal history alone that it's appropriate to go up 10%. That's what it had to do if it was going to depart under 401.3. What it said is, considering everything, and it emphasized several factors, at least I would submit equally with criminal history. He did. He stated a range, and I thought the top of the range was 365. That was the... And then he said, based on the departure motion, I'll add 10%. Yes. And he said, take it as a departure, take it as a variance, do what you will. That was a shorthand that's not enough under the three-step... And in the statement of reasons, he didn't call it a departure. That's right. That's right. Maybe because he'd never stated the final guideline range. That's a similarity, again, between this case and Fumo, where there's this ambiguity in the record that calls for a reversal. Very quickly, the error at the final step of the procedure was that the court relied on a policy view different from the guidelines view, and it didn't explain why its policy was better. It didn't say why it's always necessary to vary above the fraud guideline range in order to achieve punishment enough. He didn't say the always. He said it had cases, right? He said, I've said this before in other cases. The guidelines, in my view, do not take adequate account of the consequences of criminal conduct. It stated it was applying a fixed criterion across cases, and we believe under Merced that counts as policy disagreement. Thank you, Your Honors. Mr. Donohue, thank you. Mr. Axelrod? Thank you, Your Honors. May it please the Court, David Axelrod for the United States of America. I want to address something very quickly. On the point of whether derive was so ambiguous or so clear that nobody could have possibly challenged that. Well, it's interesting. Defense counsel never challenged it before the district court, despite the fact that it was so obvious. So I think that's immediately a problem. Well, plain error here is neither the prosecutor nor defense counsel nor the district court found an error that was so clear. Plain error is such a misnomer for this situation, isn't it? If the error was so plain, why didn't somebody say so? Oh, correct. And I think that goes to the heart of the problem. There's simply no case, nor an application note, that supports the extra requirement which defense counsel or appellate counsel is now trying to put on this requirement. Is there a case that supports your view that funds were derived in this case? You know, no, there isn't, Your Honor. What's the extra requirement? Well, the extra requirement, Your Honors, derived is... Derived from? Derived from. If you look at the guidelines, in particular, Application Note 1 of 2B1.1, it defines what a financial institution is. And listed in that application note, it includes mutual funds... Mr. Donahue concedes to that. I'm going to get to the point. I'm not arguing whether it's a financial institution. But it lists a very broad range of financial institutions, some that advise clients, some that accumulate clients' money. It's not solely restricted to this mortgage fraud example that Appellant seems to be pushing. Because that's a very convenient example for them. Because then it limits, it cuts out investment advisors, despite the fact that they are listed in Application Note 1. Maybe you can explain how funds were derived from Brentwood or Total Wealth Management. I can, Your Honor. Brentwood's clients invested in Robert Stinson's fund in three different ways. One, they invested directly from their own bank accounts. Two, Brentwood had them invest in an IRA and then directed that money from the IRA to Brentwood. And third, the most important one, is that Total Wealth Management and Brentwood created a fund which aggregated money from different investors, was controlled by Total Wealth Management, and then Total Wealth Management sent that money to Robert Stinson. Did the record establish that Brentwood or Total Wealth Management sent in excess of $1 million from its own funds? It did not. Had this issue been briefed and been raised by defense counsel at the sentencing hearing, the record would have shown that this fund that captured all these victims in Stinson. You mean the Stinson fund? Well, no. Actually, no. It's called Altus Capital. And it was a fund created by Total Wealth Management that Brentwood used to facilitate sending investor money to Robert Stinson. But the investors all assented to, hey, we want to put our money there. And so the institutions were more of a conduit, weren't they? Well, not in the example of Altus, what I'm speaking about. Because the first step was that the investors sent their money to Altus, which was a big bank account controlled by Total Wealth Management. The investor then had no access to that account without Total Wealth Management authorizing the transaction. And that account sent $1.4 million to Robert Stinson. That was not, well, I'll go back to Justice Harris' point. That was not Brentwood's money. It was not Total Wealth Management's money. That is correct, Your Honor. Mr. Dunn, his predecessor counsel had another objection to the enhancement. And you had an expert testify at the sentencing hearing. And even though the precise issue wasn't raised at that time, your expert testified that the monies came from Brentwood's clients. Ultimately, the monies did come from Brentwood's clients. But I don't see anything in the text of that enhancement which makes that determinative. Well, except that the words derived from Brentwood, because conceitedly it's a financial institution, derived from Brentwood seem enough, don't they? Yeah, to me it means stealing from Brentwood. Stealing from Brentwood. It wasn't stealing from Brentwood. It was stealing from individual investors. Well, let's imagine a different situation, which I think might be easier for me to make this argument. Let's say that Stinson derived $1 million from a Vanguard fund or a hedge fund. Now, the money in that hedge fund or that private equity fund would be investors from all over. But we would certainly say that the fund, that Stinson derived money from the hedge fund. And that's the exact same situation here as with this Altus fund that I'm speaking about that Brentwood used to facilitate investment. In that case, perhaps a Vanguard would be responsible for that money. And so, in a sense, it would be stealing from Brentwood. I'm sorry, stealing from Vanguard. Stealing from Vanguard. And actually, in this case, that's the same thing. The receiver, who was appointed in the civil case, has actually filed a suit against Total Wealth Management for their facilitation and their role in the fraud. So they are suffering a loss, which, if you go back and look at the case law, was a determinative issue prior to the amendment of the enactment. But it wasn't over $1 million. What was that? The loss you're saying. Brentwood did suffer a loss because there's some litigation against it now. Well, this Altus fund sent $1.4 million from Altus to Robert Stinson. And I would assume, though I do not know, that that's the total loss that they face. But, I mean, to go back to the very important point, is none of this was hashed out before district court. And it's not so clear that you can say that at the time of the sentencing, the judge made the error because he didn't anticipate this new argument that hasn't been shown in any court or wasn't even made at the sentencing. And I don't think that you can say that he committed plain error at that point. Well, if it's a mistake in imposing an enhancement that should be imposed, isn't that, and it results in a substantial jail sentence, isn't that a plain error? Doesn't that qualify for a plain error? If we find that it is a mistake.  in a prison sentence by any number of years, I don't know what it is, four years perhaps. Isn't that plain error? It is if we agree that the issue was so clear that the judge made a mistake in not going that way. But I don't think we can say that. I think we can say at best it was ambiguous. I'm not sure. What can you say about the amendment? I think Mr. Donahue referred to it briefly. But there was an amendment in the year 2001 that changed the phrase affected financial institution to read derived from financial institution. Because affected was so broad it captured almost any financial transaction that involved a bank. But derived from really focuses on gross receipts. Right. Taking gross receipts as the Seventh Circuit and the Ninth Circuit have said. So with that refinement, how does this transaction qualify as derived gross receipts from financial institutions? If you have a financial institution that aggregates funds from investors and then puts them in a big bank account, let's call it, and then that bank account is defrauded for over a million dollars, I don't understand or see how that wouldn't apply under the newly amended and not the newly amended enhancement. Because the funds are still being derived from that financial institution's accounts, regardless of whether they were person A, B, or Cs originally. I don't think it's clear that that's not contemplated by the enhancement. I mean, if we're talking about deterring crimes against financial institutions, banks, mutual funds, hedge funds, then I think that's encompassed in that example. Again, I just don't think it's so clear that we can say that the judge made plain error that requires a remand. Now, turning briefly to the second argument that the judge failed to file this three-step process from Gunter, I think it's clear from the record that a three-step process was followed. And, of course, the importance of the judge following the three-step process is it allows this court reviewing the sentence to determine was the departure lawful and was the variance reasonable. It is clear, Mr. Axelrod, that the judge addressed the government's departure motion at step three, isn't it? I think, if you look at the record, I actually would say that he addressed it in step two. He first calculated the guidelines, said the guidelines were 292 and 365. Then, as he said, I'm moving to step two. I'm going to deny defendants' motion for a downward departure. I'm going to grant the government's motion for an upward departure. Your government was looking to get the criminal history moved up to a five. Well, there were multiple reasons. I was, Your Honor. That was my request. He shut you down on that. He did. I also sought an upward departure on the fact that the guidelines didn't account for an additional obstruction of justice. But the judge found multiple reasons for an upward departure. The criminal history, the gross loss and victimization, and said, I'm going to upward depart. Then he said, I'm also now going to do analysis under 3553A. Importantly, in this case, he said, I find, individually, as an alternative, that under a variance or a departure, I get to 10% more, 400 each way. Well, to an extent, there is ambiguity here. That written statement of reasons doesn't help you out, does it? Sure. I mean, with the written statement of reasons, I forget the case site. I mean, you have to go with the oral comments rather than the written, right? Right. And here, the oral comments record are very clear. Oh, I would suggest that you have to concede it was muddled. And maybe he got it right at the end, but it was anything but clear. Well, the judge did say, I'm going to go up 35%. Sorry, 10%. And if you look at United States versus Floyd, 499F3308 at 312 at note 6, this court said that a judge can give a percentage for an upward departure or downward departure, and that works with the step two analysis. So I don't know that it's that vague. But he did that in step three, didn't he? Well, I don't know. I mean, he might have done it out of place. But he certainly said, my departure is this. My variance would also be this independently. So it gives this court the analysis, the ability to go back and say, is this variance reasonable? Is this departure reasonable? It wasn't muddled as in the low flank where the judge has said, I'm taking account departure and variance in one place and didn't give the reviewing court the ability to determine exactly what was done. That wasn't the case in this case. And, I mean, the judge at step two said, I'm going to issue this. I'm going to grant the government a departure. And then he went into 3553A analysis, where he clearly contemplated criminal history, contemplated deterrence, and contemplated other factors and said, What was the grounds that he gave at step two for a departure? The grounds at step two, Your Honor, were the inadequacy of the criminal history. Shouldn't that have been an up, change the offense level? That's what you'd ask for. A ratcheting. You know, it probably should have been. No, excuse me. Change the criminal history category. It should have gone from a three to a four. Yeah. And if you interpret, which you've done, moving up 35 months, you see it's either a move over or a three to a four on the guidelines table. Okay, so that's the one ground for upward departure. Then there was the consequences. Right. That the guideline range, whatever it was, does not adequately reflect the consequences of any result in other cases. Right. And then there was, what, the broad ranging fraud here. Another one. That's what he said for the departure. Yeah. Yeah. And he's absolutely right. When he talked about the broad ranging fraud here and why departure was warranted, he wasn't speaking about fraud in general. And you get that from, if you read the entire record, instead of taking pieces out of context. He was talking about the fraud in this case, and I hope Your Honor's had the chance to read the PSR, because it really is stark in this case versus most other fraud cases. You had 150 victims right in really horrifying detail about the harm caused by Robert's incident. And the judge had the ability to read that, and he found that it was outstanding in this case and warranted either departure. I don't think we would disagree that it was a huge fraud. Mr. Donahue's position here with reference to the word consequences is that he did it as a policy matter. He's done it in other cases, and he finds that the guidelines as a matter of policy do not adequately reflect consequences of the conduct. Well, I think that's an attenuated reading of what the judge is saying. This case is nothing like Merced or Lychok, where the district court judge said, listen, I don't do this in a child pornography case, or I don't apply a career offender this way. He wasn't making a broad statement saying, in all fraud cases, I don't think the guidelines are appropriate, and so I'm going to do this. He said, in other cases, I found that this was the case, and what I'm saying here is the case because of the massive fraud. So I think it's a jump to say that he was dismissing the guidelines as a policy statement rather than just saying, in this case and in other cases, not all cases, that the consequences of the fraud are so massive  Thank you very much, Your Honor. Mr. Rexroth, thanks very much. Rebuttal, Mr. Dunne here. Several of Your Honors have referred to the written statement of reasons, which is a notable piece of this record, and if the oral pronouncement was muddled, which I think it indisputably was, the law of this court holds that subsequently entered written judgment may be consulted to clarify the district court's reasoning. Thank you. The statement of reasons here makes clear that the judge regarded his sentence as a variance, but he varied despite saying he was upward departing. We've got this half-silent... Well, he said either way it's a variance. You can consider it a variance or you can consider it a departure, even though he did it at the 3553 step. Well, the reason you can't consider... He said I would have done it as a variance. He could have done it as a variance if he'd stated he was denying an upward departure at step two and the guidelines range was 292 to 365. In light of all the circumstances, he was going to vary upward, but that's not what he said. He created this muddled record, whether he was departing up to something and then varying down or varying up. And, Your Honor, the first reason he gave for departing upward was the harm caused by the offense, as there was a great deal of harm caused. But that doesn't have to do with criminal history, which was the appropriate locus of consideration. Judge Fuentes, I think you're absolutely right that an enhancement that increases one of the very highest sentencing ranges by six years is going to tend to show plain error. And when you're enhancing and increasing a sentence under these circumstances, it's not so much to ask a court to review the text of the enhancement with reasonable care. When that's done, and when you give the sole meaning of the phrase derived from its proper meaning, then you have to look to the source. Yeah, but maybe, again, the roots are showing, but when nobody asks you, if something's not, there's no issue before you, I think we sometimes expect a little too much of district judge to go out and look for an issue. I hear you, Your Honor. As a reality. You mentioned that there was another objection raised, and while the defense should have perhaps raised this issue, there was sort of a tease in the PSR of it being the worst problem. The PSR said that Mr. Stinson only derived $690,000. Well, since the enhancement refers to a million dollars, that was obviously a big problem, and it's what the defense focused on. It's only at the sentencing hearing that evidence was introduced for the first time of more than a million dollars. As far as this Altus Fund that Mr. Axelrod has described, there is nothing about that in the record, but let me say that if there were a Vanguard hedge fund manager and that hedge fund manager were the target of the deception, that were the person whom it was the design of the scheme to deceive, then it might be fair to consider Vanguard the source. But here, even if funds were pooled, the funds only went to life's good when the individual investors were persuaded to invest because they were, unfortunately, the target. The individual investor pretty much has to sign off on the transfer of funds. Doesn't he or she have to do that? Yes, I think the record is unequivocal to that effect. Okay. Thank you. Thank you both. Thank you very much. Very good arguments. We'll take the case under advisement.